**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**DARREL CUMMINGS,**

      **Plaintiff,**

**vs.**                           **Case No. 4:07cv428-RH/WCS**

**WARDEN DUFFIE HARRISON,
SERGEANT MATTHEW T. WHIDDON,
OFFICER R. L. DURHAM,
and MATT FOUNTAIN,**

      **Defendants.**

_____/


## REPORT AND RECOMMENDATION

Defendants Harrison, Durham, and Whiddon filed a motion for summary judgment on March 4, 2009. Doc. 93. Plaintiff, a *pro se* inmate in this civil rights action, was directed to file his opposition to the motion, doc. 96, and then granted an extension of time to do so. Docs. 106, 107. Plaintiff's response was timely filed, doc. 110, and the motion is ready for review.

An answer was separately filed by Defendant Fountain, doc. 111, who was belatedly added. *See* docs. 88, 96, 97, and 101. Discovery has been deferred as to Plaintiff's claims concerning Fountain until the motion for summary judgment has been

adjudicated. *See* doc. 113. This report and recommendation concerns only the motion for summary judgment, doc. 93, and Plaintiff's response.

**Allegations of the Fifth Amended Complaint, doc. 88**

Plaintiff alleges that Defendant Whiddon falsely called on the prison radio that the Muslim inmates were "in an uproar in the dining hall." Doc. 88, p. 5. Defendant Whiddon then, allegedly, used excessive and unnecessary force against Plaintiff, throwing him into a wall. *Id.* Defendant Whiddon made numerous racial slurs and comments about Muslim inmates and attempted to prevent Plaintiff from obtaining medical treatment. *Id.*, at 6.

Later, Defendant Whiddon threatened Plaintiff for submitting a grievance, and Defendant Harrison (the warden) ignored Plaintiff's grievances and refused to put him in protective custody. *Id.*, at 7. Plaintiff further alleged that Defendant Harrison intentionally put Plaintiff into Defendant Whiddon's housing unit to permit retaliation. *Id.* Defendant Whiddon continued his threats against Plaintiff and issued Plaintiff false disciplinary reports. *Id.*

Defendant Durham intentionally caused physical harm to Plaintiff in retaliation for Plaintiff having complained about Defendant Whiddon. *Id.*, at 7-8. On another occasion, Defendant Durham against caused physical injury to Plaintiff and then refused medical attention. *Id.*, at 8. Durham allegedly fabricated an incident to justify the forced used on Plaintiff and Plaintiff was in fear for his life. Plaintiff claims that Defendant Whiddon put Plaintiff in segregation for over 305 days "as punishment for submission of this" lawsuit. *Id.*, at 11.

**Basis for Summary Judgment Motion, doc. 93**

Each of the three Defendants have submitted affidavits which flatly deny Plaintiff's allegations of retaliation, verbal or physical abuse, and constitutional violations. Defendants contend that they are entitled to judgment as a matter of law on each claim brought against them.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id.* An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986). All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts. Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769,

167 L.Ed.2d 686 (2007), *cited in* <u>Ricci v. DeStefano</u>, 2009 WL 1835138, 18, — S.Ct. —, (June 29, 2009). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Industrial Co.,</u> 475 U.S. at 587 (internal quotation marks omitted), *quoted in* <u>Ricci v. DeStefano</u>, 2009 WL 1835138, 18, — S.Ct. — (June 29, 2009).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). <u>Owen v. Wille</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

**The relevant Rule 56(e) evidence**

Defendant Whiddon was employed by the Department of Corrections from 2000 through January, 2008. Doc. 93, Ex. A (doc. 93-1).[1] During the relevant period at issue here, Defendant Whiddon "was assigned as a dorm sergeant . . . ." *Id.* On September 19, 2007, Defendant Whiddon and Officer Lamb were supervising "Muslim inmates during Ramadan but [he] did not supervise inmates who were in the dining hall." *Id.*

---

[1] References to exhibits are first to the paper copy and page number, followed by a reference (in parenthesis) to the corresponding document and page in the electronic docket. Both citations are referenced as a pro se litigant will not have access to the court's electronic docket. Defendants' exhibits are attached to document 93, Plaintiff's exhibits are attached to document 110.

Defendant Whiddon does not know who was assigned as dining hall supervisor, but he noticed that on September 19th, the inmates were "not sitting in the order that all inmates are instructed to do when seated for their meals." *Id.* Defendant Whiddon ordered the inmates to move, which they did without incident, except for Plaintiff. *Id.* Defendant Whiddon testifies that Plaintiff "began yelling in a loud and belligerent tone that they had been given permission to sit in that order." *Id.* The Defendant ordered Plaintiff "to sit in the proper seating order;" Plaintiff moved slowly, but complied. *Id.*

Plaintiff continued to yell across the dining hall at Defendant Whiddon, so the Defendant ordered Plaintiff to step outside the hall "to try to prevent [Plaintiff] from inciting the other inmates." *Id.* As Plaintiff approached the dining hall exit door, he "continued yelling at the other inmates that [they] all needed to stick together and that the white man could not enslave them anymore." *Id.* Plaintiff continued his yelling, trying to gain assistance from the other inmates. *Id.* As Plaintiff stepped outside, he was placed in restraints. *Id.* Other inmates then began approaching Defendant Whiddon and Officer Lamb, leading Defendant Whiddon to fear for his safety. *Id.* Defendant Whiddon called for assistance from other staff, but at "no point was [Plaintiff] ever assaulted by [Defendant Whiddon] or any other officer in [his] presence." *Id.* Plaintiff "did not resist being placed in restraints so there was no cause for any force to be used or any disciplinary reports to be issued for disobeying a verbal order." *Id.* Defendant Whiddon denies using any racial or religious vulgarities against Plaintiff on that date, "or any other occasion." *Id.*

Defendant Whiddon advised his supervisor of what had happened, and Captain Chambers instructed Sergeant McElveen to escort Plaintiff. *Id.* Defendant Whiddon

was not present when other inmates were placed in restraints, and the Defendant testified that all guidelines were followed when he placed Plaintiff in restraints. *Id.* Defendant Whiddon did not attempt to prevent a medical examination of Plaintiff and never approached Plaintiff later to make any threats to him or his roommate. *Id.* Defendant Whiddon denies "ever physically or verbally abus[ing]" Plaintiff in any manner or retaliating "against him for any grievances or lawsuits he may have filed . . . ." *Id.*

Defendant Robert Durham submitted his affidavit as well. Doc. 93, Ex. B (doc. 93-1). Defendant Durham has been employed by the Department of Corrections since May, 2006, and became certified as a correctional officer on November 8, 2006. *Id.* Defendant Durham states that "there were no reportable incidents on the dates [Plaintiff] alleges in his Complaint about [him]." *Id.* Defendant Durham has never "twisted or injured any inmate's arm or hand while handcuffing him." *Id.* He also avers that he has never "knowingly or intentionally placed handcuffs too tight on an inmate or handled an inmate in such a manner as to cause physical pain or injury." *Id.* Defendant Durham also states that he has "never verbally threatened to harm any inmate" and never instructed to assault an inmate by another officer. *Id.*

Defendant Durham also explained that inmates held in "confinement are visited by mental health professionals on a regular basis, and in the event of a declared mental health emergency regarding an inmate, that inmate is seen by mental health staff." *Id.* Defendant Durham has "never denied any inmate access to a mental health staff member nor . . . ever refused an inmate's request for medical attention." *Id.* Defendant Durham states that Plaintiff's allegations against him "are totally false." *Id.*

Defendant Duffie Harrison is currently employed as the warden at Franklin Correctional Institution, but at the time of the events alleged in this complaint, was the warden at Taylor Correctional Institution. Doc. 93, Ex. C (doc. 93-1). Defendant Harrison's only interaction with Plaintiff at Taylor Correctional Institution was in responding to grievances filed by Plaintiff, "either personally, or by staff at [his] direction." *Id.* Defendant Harrison did not direct staff to conceal any complaint by Plaintiff, nor has he "allowed or instructed staff to abuse or harm" Plaintiff. *Id.* Defendant Harrison has no knowledge of inmates being abused by Defendant Durham, or Sergeant Fountain as alleged by Plaintiff. *Id.* Defendant Harrison flatly refutes Plaintiff's allegations and has provided sworn testimony that he has not approved the use of segregation to punish Plaintiff for filing his complaint, nor provoked any retaliation against Plaintiff, put him at risk, or "reassigned any staff member for the purpose of causing [Plaintiff] harm." *Id.*

Plaintiff has provided his own affidavit in opposition to summary judgment. Doc. 110, Ex. A (doc. 110-1). Plaintiff asserts that he was in the dining hall at approximately 5:30 a.m. on September 19, 2007, when Defendant Whiddon entered the dining hall and ordered the Muslim inmates to get up and move. *Id.*, at p. 2 (doc. 110-1, p. 3). Plaintiff and "a few other Muslim inmates" said they were told to sit in that area by the dining hall supervisor and could also pray there as it was during Ramadan. *Id.* Defendant Whiddon then said, "You Muslim son of bitches think [you are] special." *Id.* The inmates moved as ordered by Defendant Whiddon, although Whiddon was the supervisor of Q Dormitory, not the kitchen. *Id.* Plaintiff avers that the kitchen supervisors "had previously assigned eating and prayer area for purposes of Ramadan

fasting . . . ."  *Id.*  Plaintiff did not make any racial statements to the Defendant or "incite the other Muslim participants."  *Id.*  Defendant Whiddon then told Plaintiff to get his "black ass outside," and Plaintiff immediately complied.  *Id.*  Defendant Whiddon cursed at Plaintiff, referencing Plaintiff's race and Muslim religion.  *Id.*  Plaintiff reports that Defendant Whiddon was acting in a manner "to impress a female officer" and maliciously used his radio to call for other officers, falsely reporting that fifteen Muslim inmates "were in an uproar in the dinning hall."  *Id.*

Plaintiff was facing the wall, with his back to Defendant Whiddon, when the Defendant "intentionally ran into [Plaintiff] with his shoulder from behind, sending [Plaintiff] into the wall, face first."  *Id.*  Plaintiff states that the female officer locked the dining hall door to isolate Plaintiff from the other inmates so they could not witness what was happening.  *Id.*  Plaintiff claims Defendant Whiddon snatched his arm "with great forced, then clamped a handcuff loop on [his] left wrist excessively tight."  *Id.*, at 3 (doc. 110-1, p. 4).  Using the handcuff loop for leverage, Plaintiff reports that Defendant Whiddon "literally tried to break [his] arm using excessive force."  *Id.*  Plaintiff said the Defendant twisted his left hand behind his back and forced it up to his neck.  *Id.*  Plaintiff avers that those actions were "not the result of any resistance to a lawful command" or to "quell a disturbance."  *Id.*  Plaintiff was facing the wall, back to the Defendant, and claims Defendant Whiddon's use of force "was solely motivated by his facial and religious discrimination in an attempt to demoralize [Plaintiff's] nationality and belief, by inflicting chronic and severe pain [on Plaintiff], without any adequate justification."  *Id.*  Plaintiff states that he is still unable fully to lift his left arm without pain or to extend his

left thumb to hold an object in his left hand, and has pain in his back and lower left side. *Id.*

Plaintiff states that Defendant Whiddon then directed another officer (Sergeant Dewey) to "pick out" some other Muslim inmates and lock them up. *Id.* Sergeant Dewey singled out three inmates, James Hinton, Fred Spaulding, and Gary Preston, even though Sergeant Dewey was not present during the incident. *Id.*, at 3-4 (doc. 110-1, pp. 4-5). Plaintiff states that Defendant Whiddon escorted him, and continued to make derogatory racial and religious remarks, as he was escorted toward the medical building. *Id.*, at 4 (doc. 110-1, p. 5). At one point, Defendant Whiddon cursed at Plaintiff and said, "I'm going to drop you on your head and kill you." *Id.*

Defendant Whiddon was relieved by Sergeant McElveen who finished escorting Plaintiff to medical, but not before instructing Nurse Huff, at approximately 6:00 a.m., to not treat Plaintiff's injuries. *Id.* The nurse complied, and completed a special housing health form indicating there was no use of force. *Id.* In doing so, Plaintiff avers that the Nurse "nullified" the obligation of Defendant Whiddon to complete a use of force form, which should have been used. *Id.*

Plaintiff claims that just after 9:00 a.m., he declared a "psychological emergency due to the pain" from his injuries. When the psychological specialist came to see Plaintiff, Plaintiff told him about being slammed against the wall and having his shoulder injured. Doc. 110, ex. A, p. 5 (doc. 110-1, p. 6). At that point, a use of force form was completed, and Plaintiff's injuries were examined, including an x-ray of his shoulder, pain medication, and an arm sling. *Id.* The response to another grievance acknowledges that Plaintiff had a bruise on his left shoulder and limited range of motion

of his left arm. *Id.*, ex. E (doc. 110-4, p. 23 on ECF). Plaintiff then filed a grievance concerning the treatment by Defendant Whiddon and requested protective custody. *Id.* The request was denied by Defendant Harrison, the warden. *Id.* The day following Plaintiff's submission of the grievance, Defendant Whiddon came to Plaintiff's confinement cell, angry that Plaintiff had written the grievance. *Id.*, at 6 (doc. 110-1, p. 7). The Defendant threatened Plaintiff physically, threatened to harm Plaintiff's cellmate if he reported the threats, and told Plaintiff he would see that Plaintiff spent 300 days in confinement. *Id.*

Plaintiff then wrote another grievance that same day (September 26th) concerning Defendant Whiddon's threats, again stated that he was in fear for his life, and requested protective custody. *Id.* Defendant Harrison denied Plaintiff's request and advised Plaintiff to send an inmate request to his classification officer so he could call his lawyer. *Id.* Plaintiff reported that when he submitted the request as instructed, he was issued a disciplinary report. *Id.* Plaintiff also states that despite knowing of Plaintiff's grievances, Defendant Harrison purposefully reassigned Defendant Whiddon to be supervisor of Plaintiff's housing unit. *Id.* Plaintiff believes this reassignment was intentionally made to put Plaintiff at risk of further retaliation. *Id.*

On September 28th, Defendant Whiddon kicked on Plaintiff's cell door, waking him up, and then said, "Didn't I tell you I was going to get you?" *Id.*, at 7 (doc. 110-1, p. 8). Four days later, Defendant Whiddon returned and said, "Your ass is mine" and "you're dead." *Id.* That same day, October 2nd, Plaintiff sent another grievance to Defendant Harrison advising of Defendant Whiddon's harassment, threats, and retaliation. *Id.* This grievance was approved. *Id.*

The day after Plaintiff wrote the grievance, on October 3rd, Defendant Whiddon went to Plaintiff's cell and threatened him again, and then wrote a false disciplinary report for allegedly threatening the Defendant. *Id.*, at 7 (doc. 110-1, p. 8). Plaintiff sent another grievance to Defendant Harrison about Defendant Whiddon's threats, which was returned without action. *Id.*

Defendant Whiddon caused Defendants Fountain and Durham to retaliate against Plaintiff as well. *Id.* On October 17, 2007, Defendant Durham grabbed Plaintiff's arm through the food slot door and twisted his arm saying, "Write that up!" and then threatened to break Plaintiff's arm next time. *Id.*, at 7-8 (doc. 110-1, pp. 8-9). On October 18th, Plaintiff declared an emergency and was seen by Nurse Roberts. *Id.*, at 8 (doc. 110-1, p. 9). Plaintiff reported the threat from Defendant Durham to break Plaintiff's arm, and the act of twisting and hurting Plaintiff's arm. *Id.* Plaintiff claims that the nurse did not accurately construe his complaint as being one of abuse, but merely an argument. *Id.*

Plaintiff avers that Defendant Harrison knew of the threats, the retaliation, and abuse by Defendants Fountain and Durham, but took no action to help him, and knowingly permitted them to retaliate against Plaintiff as they pleased. *Id.*, at 9 (doc. 110-1, p. 10). On December 12, 2007, Defendant Durham again twisted Plaintiff's wrist and while putting on handcuffs, put them on excessively tight. *Id.*, at 10 (doc. 110-1, p. 11). Plaintiff was in a great deal of pain, and continues to experience problems as a result of the force used against him. *Id.* Defendant Durham locked Plaintiff in a cell, refused medical treatment for him, and threatened Plaintiff if he kicked the door to get

attention. *Id.* Plaintiff was issued another fabricated disciplinary report and was punished with more time in confinement. *Id.*

Plaintiff has testified that the abuse was so great, and he was so afraid, that he declared a psychological emergency on December 14, 2007. *Id.* Plaintiff was placed on suicide watch. *Id.*

Plaintiff submitted an affidavit of another inmate, Julius Stuckey, who was housed at Taylor Correctional Institution with Plaintiff. Doc. 110, ex. B (doc. 110-1, p. 15). Mr. Stuckey states that he was also placed in confinement after the officer entered the chapel on September 10, 2007, interrupting the Muslim prayer time 30 minutes earlier than was scheduled, and yelled at them to get out of the chapel or they would be locked up. *Id.*, at 2 (doc. 110-1, p. 16). Stuckey was then locked into confinement and was there on September 19th when Plaintiff was brought into confinement. *Id.* Early on that morning he was awaked by someone yelling loudly and calling for medical help. *Id.* He looked out the window of his cell door and saw Plaintiff, who appeared to be injured, pleading with two officers for medical assistance. *Id.* His requests were denied and he was thrown into the shower and locked inside. *Id.* Stuckey heard the officers tell Plaintiff that medical would not treat him and threatened him with mace if he did not shut up. *Id.*, at 3 (doc. 110-1, p. 17).

About three hours later, Stuckey saw the psychologist in the confinement area making rounds. *Id.* Plaintiff asked for medical assistance, and the psychologist replied that he was not a medical doctor and he would need to see medical staff. *Id.* Plaintiff replied that he had been injured by officers and they were refusing to let him have medical care. *Id.* Plaintiff declared a psychological emergency, and the psychologist

then took Plaintiff out of his cell. *Id.* A couple of hours later, two nurses arrived to see Plaintiff and they took him out of his cell and back to the shower area to examine him. *Id.* He heard the nurses say that they would have to call the doctor to examine Plaintiff's shoulder. *Id., at 3-4* (doc. 110-1, pp. 17-18). On October 2 and 3, Stuckey saw Defendant Whiddon kicking on Plaintiff's cell door and heard him threatening him. *Id.*, at 4 (doc. 110-1, p. 18). He heard Plaintiff ask Defendant Whiddon if he was threatening him. *Id.* On October 17th, Stuckey saw Defendants Fountain and Durham attempting to cuff Plaintiff and telling him there was nothing wrong with his arm. *Id.* He observed Defendant Durham pulling and twisting Plaintiff's arm and Defendant Fountain was threatening Plaintiff with mace and saying they were going to break Plaintiff this time. *Id.* Plaintiff was stating that he was hurt and he was declaring a medical emergency. *Id.* Defendant Fountain told the inmates who were watching out their cell door windows to get back and then told Plaintiff to shut up. *Id.* Defendant Durham said if Plaintiff didn't shut up, just break his arm. *Id.* In November, Stuckey heard Defendants Fountain and Durham make racial comments to Plaintiff, threaten him, and harass Plaintiff by trashing his cell and locking him in the shower for an hour for a strip search. *Id.*

Plaintiff also submitted the statements of several inmate witnesses to the incident in the dining hall on September 19, 2007. Doc. 110, Ex. A (doc. 110-2, pp. 5-28). None of those statements corroborate the events alleged in the disciplinary report,[2] that Plaintiff was attempting to incite a riot, but state generally that in the dining hall,

---

[2] The disciplinary report was submitted by Plaintiff and is filed on the electronic docket as doc. 110-4, pp. 1-7).

Defendant Whiddon told the Muslim inmates to move, and Plaintiff simply responded that they had been told to sit there. Defendant Whiddon then ordered Plaintiff outside and said he had something for him. *Id.* Only one of those inmate statements indicated there was a heated exchange between Plaintiff and Defendant Whiddon. *Id.*, at p. 28.

**Analysis**

In recognizing the Eighth Amendment's prohibition on the infliction of "cruel and unusual punishments," the Supreme Court has forged two kinds of prisoner cases that are actionable: complaints regarding conditions of confinement and complaints of an excessive use of force. *See, e.g.*, Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); Whitley v. Albers, 475 U.S. 312, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986); Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). In a conditions of confinement case, the inmate must show that an official disregarded an excessive risk to the inmate's health or safety. Farmer, 511 U.S. at 837. In an excessive force case, the inmate must demonstrate that the defendant acted "'maliciously and sadistically for the very purpose of causing harm.'" Whitley, 475 U.S. at 320-21, *quoting* Johnson v. Glick, 481 F.2d 1028, 1033, *cert. denied* 414 U.S. 1033 (1973).

Plaintiff has provided evidence of actual physical abuse and contact by Defendants Whiddon and Durham. Plaintiff has also provided evidence of repeated verbal threats, including death threats. Generally, "verbal threats, without more," are insufficient "to state a cause of action under the Eighth Amendment." Chandler v. District of Columbia Dept. of Corrections, 145 F.3d 1355, 1360 (D.C. Cir. 1998), *citing* Hudson v. McMillian, 503 U.S. 1, 16, 112 S. Ct. 995, 117 L. Ed. 2d 156

(1992)(Blackmun, J., concurring).  Nevertheless, Justice Blackmun observed in his concurring opinion that:

> . . . [i]t is not hard to imagine inflictions of psychological harm -- without corresponding physical harm -- that might prove to be cruel and unusual punishment....  [T]he Eighth Amendment prohibits the unnecessary and wanton infliction of "pain," rather than "injury."  ... "Pain" in its ordinary meaning surely includes a notion of psychological harm.

Hudson, 503 U.S. at 16, *quoted in* Chandler, 145 F.3d at 1360.  The court noted in Chandler that the Eighth Circuit has held open the possibility that verbal threats "could violate the Eighth Amendment if the resulting harm were sufficiently severe."  145 F.3d at 1360-1361, *citing* Freitas v. Ault, 109 F.3d 1335, 1338 (8th Cir. 1997) (recognizing the possibility of a § 1983 action for physical and psychological harm from sexual harassment but declining to find that "welcome and voluntary sexual interactions" could constitute an Eighth Amendment violation), and *citing* Watson v. Jones, 980 F.2d 1165 (8th Cir. 1992) (reversing grant of summary judgment based on disputed evidence concerning whether female correctional officer subjected the male inmate plaintiffs to sexual harassment by "physically intrusive pat-down searches.").

It is worth noting that other claims of verbal threats have been recognized by the courts as potentially violative of the Eighth Amendment if accompanied by extreme psychological harm:  Babcock v. White, 102 F.3d 267, 273 (7th Cir. 1996) (noting that "the Constitution does not countenance psychological torture merely because it fails to inflict physical injury."); Northington v. Jackson, 973 F.2d 1518, 1522-24 (10th Cir. 1992) (finding that "psychological injury may constitute pain" under the Eighth Amendment's excessive force standard where parole officer held gun to prisoner's head while threatening to kill him); *see also* Freitas, 109 F.3d at 1338.  The Northington court made

a point of distinguishing the earlier case of <u>Collins v. Cundy</u>, 603 F.2d 825, 827 (10th Cir. 1979), by construing the allegations there, which were held insufficient to state a § 1983 claim, as being nothing more than "a sheriff's idle threat to hang a prisoner." Thus, despite the general principle that verbal threats are insufficient to state a claim, some cases have recognized that verbal threats to kill an inmate do present an Eighth Amendment claim. *E.g.*, <u>Chandler</u>, 145 F.3d at 1360-61; <u>Northington</u>, 973 F.2d at 1524; <u>Hudspeth v. Figgins</u>, 584 F.2d 1345, 1348 (4th Cir. 1978) (reversing dismissal of prisoner's § 1983 suit alleging that a guard threatened to have prisoner killed because he had a suit pending against the prison and noting that "intentionally placing [the inmate] in fear for his life if he pressed his court actions . . . would inflict such suffering as to amount to unconstitutional punishment.").

The threats as presented in Plaintiff's affidavit reveal sufficient psychological harm to survive. This is especially true as the verbal threats are alleged to have been continuing and combined with physical assaults. Since Plaintiff has shown a genuine dispute of material fact, the motion for summary judgment should be denied. Plaintiff has demonstrated continuing threats, due to his exercising his First Amendment rights to file grievances and, as stated by Plaintiff, due to discrimination against him as a Black Muslim. The threats, as shown by Plaintiff, are difficult to view as anything more than "malicious and sadistic."

A claim that excessive and unnecessary force was used by correctional officers is founded upon the Eighth Amendment and requires a showing of "unnecessary and wanton infliction of pain." <u>Whitley v. Albers</u>, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). Relevant to the inquiry will be "the need for the application of

force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." *Id.* at 320; *see e.g.*, Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir. 1991); Ruble v. King, 911 F.Supp. 1544, 1554 (N.D. Ga. 1995). In evaluating such a claim, courts "must balance the 'prisoner's Eighth Amendment rights with the competing institutional concerns for the safety of prison staff and inmates.'" Ruble, 911 F.Supp. at 1554, *quoting* Williams, 943 F.2d at 1575.

Furthermore, while the absence of serious injury is relevant to an excessive force claim, that does not end the inquiry. Baldwin v. Stalder, 137 F.3d 836, 839 (5th Cir. 1998), *citing* Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992). In Hudson v. McMillian, the Court stated that "the Eighth Amendment's prohibition of cruel and unusual punishment excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.' " Siglar v. Hightower, 112 F.3d 191, 193-94 (5th Cir. 1997), *quoting* Hudson, 503 U.S. at 10, 112 S. Ct. at 1000 (considering the "physical injury" requirement of the PLRA). "[T]he injury must be more than *de minimus*, but need not be significant." Siglar, 112 F.3d at 193.

As noted by the Supreme Court, "[t]he absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." 503 U.S. at 7, 112 S. Ct. at 999; *see also* Harris v. Chapman, 97 F.3d 499, 505 (11th Cir. 1996), *cert. denied* 520 U.S. 1257 (1997). This is only one part of the inquiry. If prison officials did not use force "in a good-faith effort to maintain or restore discipline," but did so "maliciously and sadistically to cause harm" *see* Hudson, 503 U.S. at 7, 112 S.Ct. at 999, an inmate presents a viable claim.

The use of force in this case, whether *de minimis* injury or not, is the type of force that might be considered by a reasonable jury to be 'repugnant to the conscience of mankind.' " Plaintiff's evidence is that because he was not creating a disturbance, Defendants were not acting in good faith but, rather, maliciously, solely to cause him harm and punishment. A reasonable jury could find that the use force on Plaintiff was unnecessary, excessive, and designed to harm him because he is Black or because he practices the Muslim faith. A genuine dispute of material fact exists as to this claim.

Furthermore, Plaintiff has presented evidence that Defendant Harrison, the warden, had the ability to remove Plaintiff from the supervision of Defendant Whiddon, but refused to do so and denied Plaintiff's request for protective custody. Intentionally subjecting an inmate to a risk of harm, as was presented by Plaintiff, and knowingly putting Plaintiff under the supervision of an officer alleged to have harmed him and threatened him could be viewed by a reasonable jury as violative of Plaintiff's Eighth Amendment rights. Summary judgment should be denied as to Plaintiff's claim against Defendant Harrison as well.

"It is well established that a prisoner's constitutional rights are violated if adverse action is taken against him in retaliation for the exercise of his First Amendment rights." Pate v. Peel, 256 F.Supp.2d 1326, 1336 (N.D. Fla. 2003), *citing* Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003); Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir.1997); Wright v. Newsome, 795 F.2d 964 968 (11th Cir. 1986); Adams v. James, 784 F.2d 1077, 1080 (11th Cir. 1986). Prison officials may not infringe on an inmate's First Amendment right to petition the government for a redress of his grievances with a practice that is "not reasonably related to legitimate penological objectives" or take

certain actions "with the intent of chilling that First Amendment right."  Harris v. Ostrout,

65 F.3d 912, 916 (11th Cir. 1995), *citing* Turner v. Safley, 482 U.S. 78, 85-89, 107 S.Ct.

2254, 2260-61, 96 L.Ed.2d 64 (1987), and Wildberger v. Bracknell, 869 F.2d 1467, 1468

(11th Cir. 1989); *see also* Pate, 256 F.Supp.2d at 1336.  Retaliation in the prison setting

may be established by demonstrating that a prison official took adverse actions against

an inmate because he filed a grievance.  *See* Farrow, 320 F.3d at 1248; Pate, 256

F.Supp.2d at 1336.

A prisoner may not rely on a general attack upon a defendant's motivation, but

must produce "affirmative evidence" of retaliation.  Crawford-El v. Britton, 523 U.S. 574,

600, 118 S.Ct. 1584, 1598, 140 L.Ed.2d 759 (1998).  This requirement for such

evidence exists because of "the ease with which claims of retaliation may be fabricated"

by inmates and the "near inevitability" that prisoners will take exception with the

decisions of prison officials.  Pate, 256 F.Supp.2d at 1336-37, *citing* Dawes v. Walker,

239 F.3d 489, 491 (2nd Cir.2001), impliedly overruled in part on other grounds by

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

Nevertheless, a prisoner will not be held to a heightened burden of proof.  Crawford-El,

523 U.S. at 580-86, 118 S.Ct. 1584 (holding that in retaliation claim prisoner could not

be required to show "clear and convincing" evidence of defendant's unconstitutional

motives).

The Mount Healthy and Pickering decisions guide analysis of a First Amendment

retaliation claim even in the prison context.  Pate, 256 F.Supp.2d at 1339; *relying on*

Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968),

Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50

L.Ed.2d 471 (1977); *see also* <u>Osterback v. Kemp</u>, 300 F.Supp.2d 1238, 1251 (N.D. Fla.

2003). Although the framework was established in the employment context, it is

beneficial to maintain uniformity in these types of cases. The employment four-step

analysis is reduced to a three-step analytical framework, but continues to provide a

workable standard to guide all retaliation cases. This framework, derived in large part

from the Sixth Circuit's opinion in <u>Thaddeus-X v. Blatter</u>, 175 F.3d 378 (6th Cir. 1999),

will be applied in evaluating Plaintiff's retaliation claim.[3] <u>Osterback</u>, 300 F.Supp.2d at

1252; <u>Pate</u>, 256 F.Supp.2d at 1337-38. Thus, Plaintiff must demonstrate (1) that he

engaged in protected First Amendment activity, (2) suffered an adverse action because

of that activity, and (3) show a causal connection between the two. If Plaintiff comes

forward with such evidence, the burden shifts to the Defendant to prove that he would

have taken the same actions anyway for legitimate reasons. Since this is Defendants'

motion for summary judgment, however, and Plaintiff has the ultimate burden of proof,

---

[3] Two other circuits have applied the <u>Pickering</u> and <u>Mount Healthy</u> test to First Amendment claims of retaliation in the prison setting. <u>Rauser v. Horn</u>, 241 F.3d 330, 333-334 (3d Cir. 2001); <u>Hynes v. Squillace</u>, 143 F.3d 653, 657 (2d Cir. 1998); <u>Babcock v. White</u>, 102 F.3d 267, 275 (7th Cir. 1996). The Sixth Circuit still follows <u>Thaddeus-X</u>. <u>Bell v. Johnson</u>, 308 F.3d 594, 609 (6th Cir. 2002). Two other circuits have not adopted a burden-shifting framework, but use a more stringent "but for" analysis. *See* <u>Peterson v. Shanks</u>, 149 F.3d 1140, 1144 (10th Cir. 1998) (requiring prisoner to "prove that 'but for' the retaliatory motive, the incidents" which he claims were retaliatory "would not have taken place."); <u>Goff v. Burton</u>, 7 F.3d 734, 737 (8th Cir. 1993), *cert. denied* 512 U.S. 1209, 114 S.Ct. 2684, 129 L.Ed.2d 817 (1994) (declining to use Mount Healthy analysis in retaliatory transfer case and applying the more stringent "but for" test; "prisoner must prove that retaliation was the actual motivating factor for the transfer."). The Eleventh Circuit, however, has rejected this "but for" standard for Plaintiff's proof, as noted above, so these decision are not persuasive. <u>Osterback v. Kemp</u>, 300 F.Supp.2d 1253-54. Indeed, in <u>Osterback</u>, it was noted that in an unpublished opinion, the Eleventh Circuit used this simplified analytical framework in considering a prisoner's claim of retaliation. *Id.; see also* <u>Texas v. Lesage</u>, 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999) (utilizing the <u>Mount Healthy</u> framework in considering a § 1983 equal protection claim).

Defendant need only point to evidence as to the legitimate reason and Plaintiff must show that there is a genuine dispute of material fact concerning Defendant's defense. *See* Osterback, 300 F.Supp.2d at 1254.

Plaintiff has come forward with evidence showing the first element of his retaliation claim – that he engaged in protected First Amendment activity. It is undisputed that Plaintiff filed administrative grievances concerning his treatment by Defendant Whiddon. As for the second and third elements, Plaintiff has alleged that both Defendants Whiddon and Durham used physical harm and threats of more harm at Plaintiff, telling him to write it up. Plaintiff has also presented evidence showing that he was issued disciplinary reports as a means to punish Plaintiff for writing grievances. In light of the evidence presented by Plaintiff, there is a genuine dispute of material fact on this issue. Plaintiff has come forward with sufficient evidence showing that he was subjected to adverse consequences because of his grievances.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' motion for summary judgment, doc. 93, be **DENIED** because there is a genuine dispute of fact as to each of Plaintiff's claims, and this case be **REMANDED** for further proceedings.

**IN CHAMBERS** at Tallahassee, Florida, on January 8, 2010.


 s/      William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.